# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## BECKLEY DIVISION

GREGORY CARTER,

        Plaintiff,

v.                                                   CIVIL ACTION NO. 5:15-cv-04984

UNITED STATES OF AMERICA,

        Defendant.

## MEMORANDUM OPINION AND VERDICT

On the 23rd day of July, 2019, came the Plaintiff, Gregory Carter, in person and by counsel, Mark R. Staun, and also came the United States by its Assistant United States Attorneys, Matthew C. Lindsay and Jason S. Bailey, for a bench trial in the above-styled matter. The bench trial continued on July 24, 2019, and on August 27, 2019. The Plaintiff was an inmate at FCI Beckley between approximately December 2013 and June 2018. He alleges that a pre-existing ankle injury was exacerbated when he fell after prison employees required him to remain in a flooded cell. The Court has reviewed the *Defendant United States of America's Proposed Findings of Fact and Conclusions of Law* (Document 109) and the *Plaintiff's Proposed Findings of Fact and Conclusions of Law* (Document 111), as well as all testimony and exhibits introduced during trial.

For the reasons stated herein, the Court concludes that the Plaintiff has demonstrated by a preponderance of the evidence that his injuries were the result of negligence of employees of the United States acting within the scope of their employment. Therefore, the Court finds that the United States is liable for Mr. Carter's injuries sustained in the fall in his cell.

# FINDINGS OF FACT

Mr. Carter injured his right ankle in two falls prior to his incarceration. On November 12, 2013, he was involved in a work-related accident and suffered a minor sprain. Medical records and testimony indicate that it was resolved within approximately a week. He slipped on ice on December 10, 2013, and suffered a more serious sprain. A VA hospital provided crutches and an air cast. He reported to FCI Beckley on December 13, 2013, and informed medical staff of the sprain. They issued a boot in place of the air cast and permitted him to continue using the crutches. He was also assigned to a downstairs housing unit and lower bunk because of his ankle injury.

He continued to receive medical care with slow improvements to his ankle, moving to a single crutch, then a cane, and giving up the boot. He was scheduled to have an MRI of his ankle. At the last doctor's visit prior to the fall at issue, on March 28, 2014, he reported pain at a level of 3/10. The ankle remained swollen and painful. Mr. Carter testified that he did not return to medical during the month of April because his ankle continued to improve.

In the early morning hours of May 3, 2014, a water leak resulted in approximately two inches of water flooding the cell Mr. Carter shared with Clifton Perry. The Court found both Mr. Carter and Mr. Perry quite credible.[1] Both offered frank, direct testimony, did not hesitate to answer questions posed by counsel for either party, and were forthcoming in answering questions that could reflect negatively on their character, including describing the crimes that brought them

---

1 In contrast, the BOP employees who testified did not appear credible. Their testimony conflicted with prior statements and written notes in some instances. They appeared defensive and combative. Lieutenant Pritt, in particular, frequently gave non-responsive comments rather than directly answering questions. Thus, where there was a discrepancy between the accounts of Mr. Carter and/or Mr. Perry and those of Lt. Pritt, Lt. Austin, and Captain Smith, the Court generally credits the testimony of Mr. Carter or Mr. Perry.

to federal prison. Their accounts of the events are largely corroborative, although their recollections differ in certain respects. Those differences are of the type which are common or expected when multiple people try to independently recall the details of events that occurred years in the past without rehearsing to ensure entirely consistent testimony. Where the accounts differ, the Court finds Mr. Carter more credible because his recollections appeared clearer, as would be reasonable given that the events had a more substantial impact on his life and he reviewed his recollections more frequently as a result of the medical care, institutional discipline, and litigation that resulted.

One area in which they offered different accounts is when the leak began. Mr. Carter testified that the water leak began in the evening of May 2, 2014, and he reported it to a correctional officer at that time. He stated that the officer provided him with a mop and bucket to clean up the water before lockdown on May 2, 2014, but did nothing to resolve the water leak. Mr. Perry testified that the leak began overnight, and he first noticed it when he woke between 5:00 and 5:30 a.m. on May 3, 2014. Regardless of when the leak began, shortly after 5:00 a.m., the cell had about two inches of water on the floor. The men pressed the distress button at approximately 5:30 a.m. Correctional Officer Lagowski[2] responded but refused to open the cell door to facilitate cleaning up the water or otherwise resolve the issue. Officer Lagowski reported the incident to Lieutenant Darrell Pritt, and they agreed that nothing should be done until shift change when the cells would be unlocked. According to both Mr. Perry and Mr. Carter, shift change occurred around 7:15 to 7:30, approximately two hours after the first distress call.[3]

---

2 Officer Lagowski died prior to the trial.
3 Mr. Perry did not testify as to the exact time of shift change, but indicated that on May 3, cells were opened for the day 30 to 40 minutes after Mr. Carter was taken away in the wheelchair, which occurred sometime after 6:30 a.m.

Mr. Carter went back to bed but had to get up to use the rest room after a short time. While trying to maneuver, with his cane, the few steps from the toilet back to his bed, he slipped and fell, twisting and re-injuring his ankle. Mr. Perry hit the distress button to notify staff that Mr. Carter had been hurt.

Officer Lagowski returned to the cell, and Mr. Carter reported his fall and requested medical assistance. Officer Lagowski said he wanted Mr. Carter to go to the Lieutenant's office and told him to get up, but Mr. Carter said he could not get up because of his injured ankle. Officer Lagowski called Lieutenant Pritt around 6:15 a.m. Officer Lagowski informed Lieutenant Pritt of Mr. Carter's fall and claimed that Mr. Carter had been insolent and insulted him.[4] Lieutenant Pritt testified that he did not view the situation as one that warranted use of the duress alarm. Nonetheless, he directed officers stationed elsewhere to respond to the cell and bring Mr. Carter to his office, both to await medical personnel and to address the alleged disrespect. A group of four BOP employees, including Lieutenant Austin, arrived at the cell in less than five minutes.[5] The officers handcuffed Mr. Perry and removed him from the cell. An officer ordered Mr. Carter to get up to go to the Lieutenant's office. He again explained that he could not stand on his injured ankle but was again ordered to get up. When he attempted to comply, his cane slipped and he fell again, hitting his head on a locker. Officers then helped him into a wheelchair, and he was taken to Lieutenant Pritt's office around 6:30 a.m. As they were making their way to

---

4 Officer Lagowski claimed that Mr. Carter called him a "fucking asshole." This report prompted disciplinary action against Mr. Carter after the incident. Mr. Carter and Mr. Perry both testified that they both behaved respectfully because their goal was to have the water issue resolved, and that neither used profanity. Officer Lagowski's accounts, as contained in the incident report and in a later report investigating the fall, contain different versions of events. The Court credits the accounts of Mr. Carter and Mr. Perry.

5 Fewer staff are available during the overnight/early morning shift, and a larger staff arrives in the morning when cells are unlocked and inmates move around the institution. However, staff are available to respond to incidents, and there is no dispute that there were sufficient staff available to respond from the first time Mr. Carter and Mr. Perry activated the duress button without creating any safety risk.

the Lieutenant's office, officers, including Lieutenant Austin, berated Mr. Carter for his fall and warned him that he would be sent to the SHU (special housing unit) as soon as he was medically cleared. Mr. Carter was placed in a cell in the Lieutenant's office.

Sometime after 7:00 a.m., Nurse Owens arrived and examined his ankle and head. She did not see any visible injury to his head, and Mr. Carter testified that his head, neck, and back pain from the fall resolved within a few weeks with no lasting impact. Nurse Owens noted that his ankle was swollen and tender, with a decrease active range of motion, and that he was unable to tolerate attempts of passive range of motion. She gave him an ace bandage for his ankle, and he continued to use the cane. She also ordered an x-ray, which "was negative for any bony process." (Document 125-2 at 90.)

Mr. Carter was keyed in to the SHU at 8:16 a.m. on May 3, and remained for six days. He was then moved to a top bunk in a top tier cell and threatened with being sent back to the SHU when he requested that his medical accommodation pass for a low bunk be accommodated. He was eventually returned to his original cell.

Mr. Carter's ankle continued to be swollen and painful the remainder of his time in FCI Beckley, and he continued to rely on a cane. He had an MRI on July 7, 2014. The interpretation includes the following impressions:

1. Tenosynovitis of the peroneus brevis and flexor hallucis longus tendons with no evidence of complete tendon disruption.
2. There is no ligamentous disruption.
3. There is no acute fracture.
4. Diffuse soft tissue swelling.
5. The anterior and posterior talofibular ligaments are intact.

(Document 125-3 at 83.)

On July 21, 2014, a Physician Assistant noted lateral and medial swelling and pain in the right ankle, and indicated that he reviewed the recent MRI, "which showed tenosynovitis." (Document 125-2 at 74.) On September 16, 2014, a note from Health Services states: "Inmate with history of right ankle pain and tenosynovitis on MRI in July. Inmate still complaining of pain and swelling which has been persistent since incarceration" and notes a pain scale of 6/10. (Document 125-2 at 65.) On September 25, 2014, prior to seeing the orthopedic surgeon, a medical note indicates "swelling of the right ankle both medially and laterally." (Document 125-2 at 61.) While at the BOP, he saw Dr. Syed Zahir for care related to his ankle. In the months after the MRI, Dr. Zahir diagnosed tendinitis, right ankle flexor hallucis longus and tarsal tunnel syndrome, and recommended injections and a special brace. Mr. Carter later saw Dr. Stephen Whitfield, who diagnosed posterior tibial disfunction and stress fracture medial aspect of the navicula and recommended a brace.

Both parties presented experts who reviewed Mr. Carter's medical records. The expert for the United States, Dr. Jack Ross Steele, opined that Mr. Carter suffers from chronic posterior tibial tendonitis. He offered the opinion that the May 3, 2014 fall was an acute injury that temporarily exacerbated the pre-existing chronic condition but was unlikely to have a long-term impact beyond the approximately six-week recovery period. The Plaintiff's expert, Dr. David Ede, likewise testified that the May 3, 2014 fall was an acute injury that was complicated by the chronic injury. However, Dr. Ede testified that the May 3, 2014 fall likely also contributed to the severity of the chronic condition and the symptoms shown in the July MRI. He opined that the chronic condition was likely caused by trauma, including both the December 2013 fall and the May 2014 fall, and noted that the medical records indicate tenderness in the tarsal tunnel area only

6

after the May fall. Dr. Ede testified that the presence of pain and tenderness in additional areas demonstrated, to a reasonable degree of medical probability, that the May fall contributed to Mr. Carter's chronic ankle condition, rather than causing only acute symptoms that resolved fully within weeks.

The Court credits Dr. Ede's testimony. Both experts were well-qualified in the field of orthopedic medicine, and both were paid experts who reviewed the records without examining or treating Mr. Carter. The core difference between their opinions was that Dr. Steele believed that the May 3 fall caused only an acute injury that resolved within weeks, while Dr. Ede believed it also exacerbated the chronic injury. Dr. Ede appeared more confident in his testimony. Although he testified for the Plaintiff, he was careful not to overstate his conclusions—he did not opine that the May 3 fall was the sole cause of Mr. Carter's continuing ankle problems, and he indicated that the December sprain was a more significant injury. Dr. Ede also carefully tied his opinions and conclusions to the evidence contained in the medical records, and the Court found those opinions to be well-supported. Therefore, the Court finds that Mr. Carter's pre-existing chronic ankle dysfunction was exacerbated by the May 3 fall.

## LIABILITY

### A. Discretionary Function

The United States moved for Rule 29 judgment in its favor based on the discretionary function exception to liability under the FTCA. It argues that BOP officers had discretion to determine how to handle the flooded cell, and the Court should not second-guess their judgment that the situation did not warrant taking staff from other posts to more expeditiously resolve the hazard posed by the water in Mr. Carter's cell. The Plaintiff argued for judgment in his favor,

asserting that the United States' witnesses confirmed that the flooded cell did not constitute suitable quarters, as required by statute.

The FTCA established federal jurisdiction for tort claims against the United States for damages "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). 28 U.S.C. § 2680(a) provides that the waiver of sovereign immunity for the FTCA "shall not apply to any claim…based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

The discretionary function exception applies to conduct that "involves an element of judgment or choice" and "that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988). "In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Id*. at 537. The discretionary function exception applies to decisions made pursuant to a delegation of authority by Congress to implement general provisions of a regulatory statute. *United States v. Gaubert*, 499 U.S. 315, 323 (1991). "In addition, the actions of Government agents involving the necessary element of choice and grounded in the social, economic, or political goals of the statute and regulations are protected." *Id.*

The Fourth Circuit has described the evaluation of the discretionary function exception as a "two-step analysis," beginning with determining "whether the conduct in question involves an element of judgment or choice." *Wood v. United States*, 845 F.3d 123, 128 (4th Cir. 2017) (internal quotation marks and citation omitted). "Second, when the challenged conduct is the product of judgment or choice, the court must still determine whether the decision made was 'based on considerations of public policy.'" *Id*. (quoting *Berkovitz*, 486 U.S. at 537). The Fourth Circuit further noted that "[b]ecause waivers of sovereign immunity must be strictly construed, the plaintiff bears the burden of demonstrating jurisdiction and showing that none of the FTCA's exceptions apply. *Id*. at 127.

Although the United States' witnesses did concede that a flooded cell is not suitable quarters, the Court finds that judgment as a matter of law in favor of the Plaintiff is not appropriate. The employees had discretion to determine how best to resolve the situation, and liability does not attach the instant the cell was flooded. Accordingly, a factual determination is appropriate.

The Court addressed this issue in a motion to dismiss filed prior to trial, finding that the discretionary function exception required factual findings. The facts the Court has found to be established by a preponderance of the evidence do not support application of the discretionary function exception. When they declined to take action in response to Mr. Carter's complaints of the flooded cell, Officer Lagowski and Lieutenant Pritt were not weighing competing policy interests. There was sufficient staff available to permit opening the cell to clean out the water and resolve the leak without any security risk. The officers chose to wait until the morning shift when the cell doors would be unlocked for their own convenience, not because of any public policy considerations. Therefore, the United States' oral motion for a directed verdict should be denied,

9

and the Court finds that the discretionary function exception is not applicable under the facts presented.

B. *Negligence*

The United States also argued that Mr. Carter failed to present evidence that a duty was breached, because the individuals with training in corrections all testified that Officer Lagowski and Lieutenant Pritt acted reasonably and prudently. The Plaintiff counters that expert testimony is not necessary to prove the elements of negligence, and the Court, as fact-finder, can determine whether the Defendant breached its duty to the Plaintiff.

"[T]he underlying cause of action in an FTCA claim is derived from the applicable state law. An action under the FTCA may only be maintained if the Government would be liable as an individual under the law of the state where the negligent act occurred." *Kerns v. United States*, 585 F.3d 187, 194 (4th Cir. 2009). The basic elements of a negligence claim are duty, breach of that duty, causation, and damages. "In order to establish a negligence claim in West Virginia, '[a] plaintiff must prove by a preponderance of the evidence that the defendant owed a legal duty to the plaintiff and that by breaching that duty the defendant proximately caused the injuries of the plaintiff.'" *Cline v. 7-Eleven, Inc.*, 2012 WL 5471761 (N.D.W. Va. Nov. 9, 2012) (citing *Neely v. Belk, Inc.,* 668 S.E.2d 189, 197 (W. Va. 2008)). "The ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised. The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result?" Syl. Pt. 6, *Wheeling Park Comm'n v. Dattoli*, 787 S.E.2d 546 (W. Va. 2016) (quoting Syl. pt. 3, *Sewell v. Gregory*, 371 S.E.2d 82 (W. Va. 1988)). Questions of negligence are to be decided by the trier

of fact even absent a factual dispute, if different conclusions could be drawn from the facts. *See, e.g.*, *Bradley v. Sugarwood, Inc.*, 260 S.E.2d 839, 840 (W. Va. 1979).

Mr. Carter was incarcerated at FCI-Beckley. He notified Officer Lagowski that his locked cell was flooded with water at 5:30 a.m. on May 3, 2014.[6] Officer Lagowski then informed Lieutenant Pritt, who testified that he understood that two inches of water in a cell would present a hazard for anyone, and particularly someone who required a cane to walk. It was foreseeable that the flooded cell would lead to Mr. Carter or Mr. Perry slipping or falling in the water and being injured, and the United States, through its employees, had a duty to exercise reasonable care to prevent that harm. The United States' employees instead made the deliberate decision to keep Mr. Carter and Mr. Perry in the hazardous cell for approximately two additional hours, until cells on the unit were routinely unlocked for the morning. After Mr. Carter was injured through the negligence of the United States' employees, Officer Lagowski falsely accused him of using profanity and being disrespectful, and the BOP treated the incident as cause to discipline Mr. Carter. Only after deciding to treat it as a disciplinary matter did Lieutenant Pritt take action to have officers escort Mr. Carter out of his cell. Officers were available and arrived at the cell within minutes. A reasonably prudent person in Officer Lagowski or Lieutenant Pritt's position could have sent an additional officer to the cell after the first call to open the cell and either move Mr. Carter and Mr. Perry or provide materials and assistance in clearing the water and stopping the leak.

---

6 Mr. Carter indicated that the issue of water in the cell began the night before, and he notified a staff member who provided a mop and bucket prior to lockdown. Some evidence in the record supports this version of events. However, it is not clear that Officer Lagowski or Lieutenant Pritt were aware of the water leak prior to the first duress call.

The Court further rejects the United States' argument that only its witnesses are qualified to assess what a reasonably prudent correctional officer would have done. That is a matter to be resolved by the fact-finder. In this case, the Court, as fact-finder, concludes that deliberately leaving inmates in a flooded cell is not reasonable and prudent, in the absence of an emergency or unusual security risk requiring a delay. Accordingly, the Court finds that the United States' Rule 29 motion as to negligence should be denied, and further finds, by a preponderance of the evidence, that the negligence of the employees of the United States was the proximate cause of Mr. Carter's fall and resulting injuries.

### C. Comparative Fault

The United States further moved for judgment based on comparative fault, arguing that Mr. Carter voluntarily exposed himself to the risk posed by walking in his flooded cell. It contends that Mr. Carter could have sought assistance from Officer Lagowski or his cellmate in going to the bathroom, but instead voluntarily got up from his bunk to go to the toilet and fell on his way back. Mr. Carter countered that using the bathroom when needed is not comparative negligence. He contends that the more important fact is that he notified officers of the leak and they chose to do nothing.

Under West Virginia law, "[a] party is not barred from recovering damages in a tort action so long as his negligence or fault does not equal or exceed the combined negligence or fault of the other parties involved in the accident." Syl. Pt. 3, *Bradley v. Appalachian Power Co.*, 256 S.E.2d 879, 880 (W. Va. 1979). "Thus, to assert the affirmative defense of comparative negligence, Defendant must prove that Plaintiff's negligence or fault is equal to or exceeds that of

Defendant…and/or any other involved party." *Stratford v. Brown*, No. 2:17-CV-03963, 2018 WL 5649901, at *3 (S.D.W. Va. Oct. 31, 2018) (Johnston, C.J.).

The Court finds that no evidence presented suggests that Mr. Carter was negligent or that he bore any fault for his May 3, 2014 fall. He reported that his cell was flooded. Officer Lagowski informed him that nothing would be done until cells were unlocked for the day, a nearly two-hour wait. He had no control over his environment, his reliance on a cane, or his need for the toilet. The Court declines the opportunity to find that completing basic bodily functions in privacy constitutes a decision to expose oneself to the risk of a fall on a wet floor. Because the facts and evidence do not support the theory that Mr. Carter was more than fifty percent at fault for his fall, the Court denies the United States' motion in that regard.

## DAMAGES

Having found that the United States was negligent and has asserted no viable defense, the Court must determine the amount of damages. Mr. Carter suffered short-term head, neck, and back pain as a result of his second fall on May 3, 2014, when his head hit a locker. He also suffered pain and decreased mobility as a result of the acute ankle injury, which resolved within a few weeks. In the immediate aftermath of the fall, he was subject to discipline as a result of the incident in which he was injured based on a false accusation regarding his conduct and interactions with staff during the incident. In addition to the initial discipline and time in the SHU, he was threatened with additional time in the SHU when he asked that his lower-bunk medical pass be honored in his housing assignment. Being unfairly targeted by those who remained in a position of power over him, including over his ability to receive accommodations for his injury, compounded the pain and suffering in the days following the accident.

In addition, his existing chronic ankle injury was exacerbated by the fall. Although the Court has considered the exacerbation of the chronic injury in determining the appropriate damages award, that consideration is restricted by the limitations of the evidence. Dr. Ede was unable to quantify the extent to which the fall contributed to the chronic injury. The Court therefore cannot find that the Defendant's negligence and the May 3 fall caused Mr. Carter's inability to participate in any particular activities, including returning to his former work in construction. He experiences more pain and less functionality than he would absent the May 3 fall, but damages remain limited to general non-economic damages.

Having carefully considered the facts and evidence presented and the extent of Mr. Carter's damages, which the Court has found resulted from the negligence of the United States' employees acting within the scope of their employment, the Court finds that a damages award of $60,000 is appropriate. This award adequately compensates him for the non-economic damages, including pain and suffering and emotional harm, directly arising from the negligence of the United States' employees.

## CONCLUSION

WHEREFORE, after thorough review and careful consideration, the Court finds that Officer Lagowski and Lieutenant Pritt were negligent in responding to Mr. Carter's report that his cell was flooded with water. The Court **ORDERS** that each party's oral Rule 29 motion be **DENIED**, as set forth herein, and that judgment be entered in favor of the Plaintiff and against the United States, in the amount of **$60,000**.

The Court further **ORDERS** that all pending motions in this matter be **TERMINATED AS MOOT**.

The Court **DIRECTS** the Clerk to send a certified copy of this Order to counsel of record and to any unrepresented party.

ENTER: November 4, 2019

_____
IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA